## Case No. 15,716.

### UNITED STATES v. MANN.

[2 Brock. 9.] [1]

Circuit Court, D. Virginia. May Term, 1822.

OFFICER—COLLECTIONS—FEES — SET-OFF — TREASURY RULES.

1. An officer of the United States, who has levied a sum of money on an execution in fa-

[1] [Reported by John W. Brockenbrough, Esq.]

vour of the United States, to whom the United States are indebted for fees of office in a sum greater than the amount of the execution, has a right to retain it by way of set-off, and on a motion made on the part of the United States to commit the officer for failure to pay over the money so levied, he will be permitted to show that the United States are indebted to him, and if this be shown, it is sufficient cause why he should not be attached.

[Cited in Bagley v Yates, Case No. 725; The Laurens, Id. 8,122.]

[Cited in Antoni v. Wright, 22 Grat. 883; Cartwright's Case, 114 Mass. 239; Taylor v. Mayor, etc., of New York, 82 N. Y. 24; Moore v. Tate, 11 S. W. 939.]

2. The rules prescribed by the treasury department for the adjustment of claims against the government, will, if reasonable, be respected; but if these rules go to a complete denial of justice, the court, if it have jurisdiction of the subject, cannot disregard the rights of the parties.

[Cited in Re Pitman, Case No. 11,184; U. S. v. Smith, Id. 16,346.]

At law.

MARSHALL, Circuit Justice. This is a motion on the part of the United States to commit William Mann, late deputy marshal of this district, on an attachment for not paying over a sum of money levied by him on an execution issued from this court, on a judgment obtained by the United States: and a motion on the part of the said Mann, to discharge the said attachment, because the United States are indebted to him in a larger sum, for fees due to him as deputy marshal, which fees the treasury department has refused to pay. The deputy marshal has exhibited a long account for fees against the United States, many items of which are substantiated beyond controversy. His counsel, contends that his account is clearly supported, to an amount exceeding the sum claimed by the United States. The court will not enter into a minute examination of the particulars of this account, because, if the principle should be established in favour of allowing the credits claimed, their amount may, in such a case as this, be the proper subject for a reference to a commissioner; and, should this principle be rejected, the examination will become useless. Nothing can be more clear than the right of the officer to receive his fees for services performed for the United States. In equity and justice, the claim is founded on service actually rendered. This just and equitable claim is recognised by the acts of congress, which regulate its amount. The law fixes the sum to which the marshal shall be entitled for those services which the law requires him to perform, and makes no distinction between the suits of the United States and those of an individual. The demand of the marshal, then, on the United States, for his fees of office, is as clear, both in law and equity, as his demand would be against any individual for whom the same services were performed. The United States have not sought to discriminate in this respect be-

tween themselves and other suitors. They have not required their officers to labour for the government gratuitously. The law acknowledges the obligation of the United States to pay for services rendered, in common with all others for whom the same services may be rendered. The United States are not, it is true, subject to those coercive measures which may be employed against an individual; but the duty is the same, and the theory of the law is, that this duty will be respected. Officers are appointed for the liquidation of these claims, and appropriations are made for their payment. The law is violated when these are disregarded. The treasury department may certainly prescribe its own rules for the adjustment of such claims, and those rules will, if reasonable, be respected. The dependent situation of the officers who claim, will in general secure their respect, and the desire for the preservation of that harmony which ought to exist between the departments, will secure that of the court. But when these rules go to a total denial of justice, to an absolute refusal to allow a just and legal claim, a court cannot, if it has jurisdiction of the subject, disregard the rights of the party.

It may be convenient, and may conduce to the regularity of these accounts, to the course established for them in the proper department of the treasury, to require that the officer, in suits against public debtors, should receive his fees out of the money made by an execution. In the ordinary course of things, this may be reasonable, and the officers of the court acquiesce in it. But if the United States do not proceed to judgment, or if they do not place the execution in the hands of the officer—if they receive the money through a different channel —or make any arrangement by which the officer is deprived of all means by which his claim can be satisfied, otherwise than by a direct resort to the treasury—on what principle can his application to the treasury be resisted? He has performed service for the government, for which the law entitles him to a certain remuneration, and gives the government the power to reimburse itself from the individual against whom a judgment for costs is rendered. The claim against the individual is in favour of the government, not of the officer. The government settles this claim, and either receives the fees of the officer, or relinquishes them. On what pretext can the claim of the officer on the government be rejected? The clearest principles of equity and law require that it should not be rejected, and if a court be permitted to take jurisdiction of the subject, it cannot be disregarded, without disregarding also the soundest principles of law.

In an action brought by an individual against an officer, for money made by an execution, the officer would, we think, be at liberty to show that the individual was indebted to him, and would be at liberty to set-off such debt. Were it doubtful whether such an offset would be allowable in every case, it cannot, we think, be doubted that it would be allowed in many cases. If, for example, an officer had earned fees to a large amount from an individual, and were to stop the whole of them out of a particular execution, no court would overrule his claim. If, instead of an action, an attachment be resorted to, the law is, we think, the same; the duty of the officer is to bring the money into court, and should he fail to perform this duty, it is a contempt for which the court will attach him. But this attachment will not be enforced if he shows sufficient cause against it. It will not be enforced if he shows that he has paid the money to the plaintiff; neither will it be enforced, we think, if he shows that he stands, in relation to the plaintiff, in the same situation as if he had paid to him the identical money made by the execution.

We will not now inquire into the course which ought to be pursued with an officer who speculates on the situation of the plaintiff, and procures the assignment of demands against him; but we think that a direct demand of the officer in his own right upon the plaintiff, for which he is entitled to an immediate satisfaction in money, clears the contempt, and ought to arrest the attachment. The argument is the stronger if the creditor, from any cause, cannot be coerced to pay this demand. These are principles which would govern in a case between individuals; their application to a case of the United States has been doubted; that doubt appears to us to be removed by the opinion of the supreme court in the case of U. S. v. Wilkins, reported in 6 Wheat. [19 U. S.] 135, 5 Cond. Rep. U. S. 38. See, also, U. S. v. M'Daniel, 7 Pet. [32 U. S.] 1. In that case, the court, speaking of the discounts allowed by the act of March 3, 1797, c. 74 [1 Story's Laws, 464; 1 Stat. 512, c. 20], in suits brought by the United States, says: "There being no limitation as to the nature and origin of the claim for a credit which may be set up in the suit, we think it a reasonable construction of the act that it intended to allow the defendant the full benefit at the trial of any credit, whether arising out of the particular transaction for which he was sued, or out of any distinct and independent transaction which would constitute a legal or equitable set-off, in whole or in part, of the debt sued for by the United States."

The attorney for the United States would withdraw the case at bar from this opinion, because it was given in a case of contract, and in a suit regulated in some manner by the act of congress which it expounds. But we think the opinion applies substantially to this case. By examining the act referred to, we perceive that it gives no right whatever to use any discount, but regulates and restrains a right recognised as already existing. The words of the law are not that in

such a suit the defendant shall be allowed to give equitable or legal discounts in evidence, but that the cause shall be tried unless the defendant shall make oath "that he is equitably entitled to credits, &c.," and that "no claim for a credit shall be admitted on trial but such as shall appear to have been presented to the accounting officers of the treasury," &c. These words apparently give no right whatever, but recognise a pre-existing right; and if it was a pre-existing right, it existed in other cases as well as in those contemplated by this act.

The opinion of the supreme court then in the case of U. S. v. Wilkins [supra], is, we think, expressly in point; and we are governed by it in the present case. We think that Mr. Mann is entitled to set-off the fees earned by himself, for which the United States are liable, and that so far an attachment ought not to go against him; if there be any doubt respecting the amount, a commissioner must report upon it to the court.